# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as<br>cmp@lbient.com that is within the possession,<br>custody, or control of Microsoft Corporation | ) ) ) ) ) ) |

Case No. 2:23-mj-3281

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A-1*

There are now concealed or contained the items described below:

*See Attachment B-1*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code sections | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Defraud the United States of America |
| 18 U.S.C. § 1956 | Money Laundering |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. § 1001 | False Statements |
| 26 U.S.C. § 7201 | Tax Evasion |
| 26 U.S.C. §7206(1) | Subscription to a False Tax Return |
| 26 U.S.C. §7206(2) | Aiding and Assisting in the Preparation of False Tax Return |
| 26 U.S.C. § 7212 | Attempts to Interfere with Administration of Internal Revenue Laws |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

_____
*Applicant's signature*

Robbie D. Henwood, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

City and State: _____

_____
*Judge's signature*

Charles F. Eick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Valerie L. Makarewicz (x0756)

**AFFIDAVIT**

I, Robbie D. Henwood, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the United States Department of the Treasury, Internal Revenue Service - Criminal Investigation (hereinafter referred to as IRS-CI) and have been so employed since September of 2005.  I currently serve as a Special Agent with IRS-CI in the Oakland Field Office.  As an IRS-CI Special Agent, my duties include the investigation of criminal violations for the Internal Revenue Service (IRS) of the Internal Revenue Code (Title 26, United States Code), bank secrecy statutes (Title 31, United States Code), and other related criminal offenses under Title 18 of the United States Code.

2.   I received a bachelor's degree in business administration, with a concentration in accounting, in 2000, and a Master of Science in accountancy in 2001, both from Trinity University.  I have been licensed as a Certified Public Accountant (CPA) in the state of Texas since 2003.  My professional and academic training also includes six months of training at the Federal Law Enforcement Training Center in Glynco, Georgia.  This training included the Criminal Investigative Training Program that taught me courses in law enforcement techniques, federal criminal statutes, conducting criminal investigations, and the execution of search warrants.  This training also included instruction in the law of search and

seizure under the Fourth Amendment of the United States Constitution.  In addition to the criminal investigative training, I completed a Special Agent Basic Training course, which included courses in financial investigative techniques, legal principles, and statutes representing criminal violations of the United States Code as enumerated in Titles 18, 26, and 31.  I have been involved in numerous investigations of alleged violations of the Internal Revenue Code, and other financial crimes including mail and wire fraud, money laundering, and conspiracy.  I have participated in numerous interviews of witnesses and participated in the execution of search warrants involving suspected criminal violations of the Internal Revenue Code and other financial crimes where records of the type involved in this investigation were seized.

## II.  Seeking Email Search Warrants

3.    I make this affidavit in support of an application for a warrant for information associated with the account identified as cmp@lbient.com ("SUBJECT ACCOUNT-1"), an enterprise account that is stored at premises controlled by Microsoft Corporation ("PROVIDER-1"), a provider of electronic communication and remote computing services, headquartered at 1 Microsoft Way, Redmond, WA 98052.[1]

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel PROVIDER-1 and PROVIDER-2 pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).  See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction")
*(footnote cont'd on next page)*

4.    I also make this affidavit in support of an application for a warrant for information associated with the account identified as chuckpach@aol.com ("SUBJECT ACCOUNT-2"), an enterprise account that is stored at premises controlled by Yahoo Inc. ("PROVIDER-2"), a provider of electronic communication and remote computing services, headquartered at 1199 Coleman Avenue, San Jose, CA 95110.

5.    The information to be searched is described in Attachments A-1 and A-2.

6.    This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require PROVIDER-1 and PROVIDER-2 to disclose to the government copies of the information

---

and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

(including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

7.  As described more fully below, I respectfully submit there is probable cause to believe that the information associated with SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2 constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, Section 371, conspiracy to defraud the United States of America, and Title 26, United States Code, sections 7201 (evasion of payment of tax), 7206(1) (subscription to a false tax return), 7206(2) (aiding and assisting in the preparation of a false tax return), and 7212 (attempts to interfere with administration of internal revenue laws).

8.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are

approximate, and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF INVESTIGATION</u>

9.   On October 15, 2015, Charles "Chuck" PACHECO (PACHECO) made and subscribed under penalty of perjury an U.S. Individual Income Return, Form 1040, reporting $7,102,674 in taxes due for 2014 to the IRS.

10.   Since at least April 2016, PACHECO and his attorney, Jeffrey HELFER (HELFER), have allegedly committed numerous acts to evade payment of the taxes due and owing to the IRS and to obstruct its collection efforts of PACHECO's 2014 tax liability, including the following:

a.   PACHECO and HELFER employed a variety of means to evade the IRS's collection efforts, including, but not limited to, opening accounts at new institutions unknown to the IRS and transferring PACHECO's money into the accounts, sending PACHECO's money abroad, converting cash into concealable assets like artwork, and transferring PACHECO's money to either nominee accounts or HELFER's attorney-client trust accounts that was then commingled with other clients' money, and later returned by HELFER to PACHECO or disbursing them at his direction.

b.   Since April 2016, HELFER made false statements to the IRS on behalf of PACHECO that included that he did not have access to PACHECO's financial information, and that PACHECO was financially unable to pay his taxes.  For years, HELFER delayed the IRS's collection efforts for PACHECO by promising returns and documents to the IRS.

        c.    In April 2020, HELFER provided an IRS revenue
officer an IRS Form 433-A, Collection Information Statement,
signed by PACHECO under penalty of perjury that contained false
statements and omitted many of PACHECO's assets available to
collect upon to pay his large tax debt.

                 IV.   **STATEMENT OF PROBABLE CAUSE**

**1. Background**

    11.  According to representations HELFER made to the IRS,
PACHECO is an avid gambler.  He works as a film producer and as
a partner and investor in multiple business entities, as
described in more detail later:

        a.    I know from my review of corporate and tax
records that PACHECO is the sole owner of the Chuck Pacheco
Corporation, established in 2011, that has an account with Wells
Fargo Bank ending 8602.

        b.    I know from bank records that PACHECO has a
personal account with Wells Fargo Bank ending 0826.

    12.  From public records searches, I know the following
about HELFER:

        a.    HELFER has been licensed to practice law in
California since June 11, 1985, and owns his own practice in
Woodland Hills, California.

        b.    HELFER was licensed as a certified public
accountant in the State of California from May 6, 1983, through
August 31, 1997.  The IRS issued HELFER a Preparer Tax
Identification Number (PTIN) in 2011, a requirement for all paid
tax return preparers so the IRS can identify what professional

prepared a tax return.  From my review of IRS records, I know that HELFER has been authorized to represent PACHECO before the IRS since at least 2011.

c.    Based on bank records I reviewed, HELFER maintained IOLTA accounts (Interest on Lawyers' Trust Account) with Wells Fargo Bank with account numbers ending 1241 and 3114, and with First Republic Bank ending 2629.

## 2. **Origin of PACHECO's Tax Due and Owing**

13.   I reviewed PACHECO's federal income tax returns filed with the IRS and know the following:

a.    On or around October 17, 2015, PACHECO filed a U.S. Individual Income Tax Return, Form 1040, for 2014 signed by him under penalty of perjury.  On the return, PACHECO listed HELFER's business address as his home address.  Earlier, in April 2015, PACHECO requested an extension to file his 2014 income tax return and paid $100,000 to the IRS at that time towards his 2014 tax liability.

b.    On his 2014 tax return, PACHECO reported Schedule C net income of $19,238,098 from gambling, withholding in the amount of $60,852, and with credit for the payment made with his extension, reported a final amount of tax due of $7,102,674 for 2014.  PACHECO did not make any payments towards his outstanding liability for 2014 when he filed the return.

c.    I interviewed Patrick Lewis (Lewis), a certified public accountant.  Lewis told me that a few months after PACHECO's 2014 tax return was filed, HELFER hired him to prepare and file an amended 2014 return for PACHECO.  On August 23,

2016, HELFER sent a FedEx package to the IRS that contained a 2014 IRS Form 1040X, Amended U.S. Individual Income Tax Return, for PACHECO that PACHECO and Lewis signed under penalties of perjury.  On the amended 2014 return was an explanation that stated that two "K-1s" were inadvertently excluded from the original 2014 tax return as filed.  PACHECO's inclusion of the partnership income/losses reported on two Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., reduced his adjusted gross income by $611,750, along with a reduction of claimed itemized deductions by $69,690.  As such, on the 2014 amended return, PACHECO reported that he owed the IRS $6,853,129 in outstanding tax.

> A. PACHECO Reported a 2015 Loss of Over $3.5 Million to the IRS While Reporting a Profit of Over $4 Million to His Bank for the Same Period

d.    In the FedEx package to the IRS was also a 2015 U.S. Income Tax Return for an S Corporation, Form 1120S, for the Chuck Pacheco Corporation that PACHECO and Lewis signed under penalties of perjury.  On line 21 of the 2015 Form 1120S filed for the Chuck Pacheco Corporation, an ordinary business *loss* of $3,523,686 was reported.

e.    However, based on my review of records from First Republic Bank, one month after filing the aforementioned Form 1120S reporting a loss, on September 27, 2016, PACHECO signed and dated a document entitled "2015 Profit and Loss Statement" for the Chuck Pacheco Corporation.  On or about October 5, 2016, HELFER provided the profit and loss statement to First Republic Bank on PACHECO's behalf showing a net *profit* of $4,089,815.

f.    Based on my review of IRS records dated June 29, 2023, since the filing of his extension request in April 2015 through mid-January 2023, PACHECO has not voluntarily (as opposed to amounts received by the IRS pursuant to levy) paid any additional amount towards his 2014 liability. However, in January, April and May 2023, PACHECO made four voluntary payments of $50,000 towards his 2014 liability.  As of June 29, 2023, PACHECO's outstanding liability to the IRS for tax year 2014 was $7,833,967.46.

3. **PACHECO and HELFER's Avoidance of IRS Collection Efforts**

14.    Based on my investigation thus far, I believe PACHECO and HELFER took actions by several different methods to avoid the IRS's efforts to collect on PACHECO's 2014 outstanding tax liability, based in part on the following:

B. While HELFER Claimed PACHECO Could Not Pay His Tax Liability, PACHECO Sent Millions to Art Auctioneers and HELFER

15.    Beginning in April 2016, the IRS, through its Revenue Officer Marti Murphy (Murphy), began inquiring of HELFER, PACHECO's authorized representative before the IRS, as to the payment of the 2014 tax liability.  I know this based on my review of Murphy's contemporaneous notes, called an Integrated Collection System (ICS) history.  On April 4, 2016, Murphy and HELFER spoke on the telephone.  Records I reviewed indicate that, at this time, Murphy had identified accounts held in PACHECO's name at Wells Fargo, Bank of America, JPMorgan Chase Bank and City National Bank as sources from which the IRS could potentially collect.

16.   From my review of bank records and a public records search on the website of the California Secretary of State, I know that the day after the phone call between Murphy and HELFER regarding PACHECO's 2014 tax liability, April 5, 2016, PACHECO formed Nine Nights All-Star Weekend, LLC (All-Star Weekend) with the Secretary of State of California[3] as an entertainment company.  Thirteen days later, on April 18, 2016, PACHECO opened a new personal account with First Republic Bank ending 0493 and an account in the name of All-Star Weekend ending 0527 for which he was the sole signatory.

17.   From my review of bank records, wire transfer statements, and Murphy's ICS History, I know that on April 12, 2016, eight days after HELFER's call with Murphy, PACHECO wired $1,575,000 from the Chuck Pacheco Corporation account at Wells Fargo ending 8602 to HELFER's IOLTA account at Wells Fargo Bank ending 1241.

18.   From my review of bank records and a public records search on the website of the California Secretary of State, I know that, between May 2, 2016, and May 24, 2016, the account of All-Star Weekend ending 0527 received $3.7 million in deposits

---

[3] All-Star Weekend's initial filing with the California Secretary of State listed no managers or officers, only an agent for service of process as a law firm, Morris Yorn Barnes & Levine, PC.  On May 2, 2016, All-Star Weekend filed a statement of information that listed PACHECO as its sole manager, with the same law firm as the agent for service of process for the LLC.

from an entity HELFER registered with the California Secretary of State called Eye Productions All Star, LLC.[4]

19. Based on my review of Wells Fargo and First Republic Bank records and records from Christie's Inc., an art brokerage, I know the following:

    a. On June 21, 2016, PACHECO wired $2,045,000 from his personal Wells Fargo account ending 0826 to Christie's Inc. for the purchase of artwork on May 8, 2016.

    b. On June 28, 2016, PACHECO transferred $1,150,000 from the All-Star Weekend account ending 0527 to his First Republic Bank personal account ending 0493. Later that day, PACHECO wired $1,150,000 to Christie's Inc. for the purchase of art on May 11, 2016.

20. Based on my review of Wells Fargo records and records from Sotheby's, an art brokerage, I know the following:

    a. On April 28, 2016, PACHECO wired $1,534,561.73 from his personal account at Wells Fargo ending 0826 to Sotheby's in England for the purchase of artwork on February 10, 2016.

    b. On May 5, 2016, PACHECO wired $1,379,431.86 from his personal account at Wells Fargo ending 0826 to Sotheby's in England for the balance owed for his purchase of artwork on February 10, 2016.

---

[4] Per the California Secretary of State, Eye Productions All Star, LLC was incorporated on February 4, 2016 by HELFER, the entity's address is HELFER's law office, and the CEO/sole officer/manager is David Cure, whose address is also the same as HELFER's law office.

21.  The above demonstrates one method of PACHECO and
HELFER using funds for purchases other than payment of his 2014
outstanding tax liability.

C. "Loans" with Dey

22.  On February 17, 2021, I interviewed Dr. Prabaal Dey
(Dey). Dey stated he met HELFER through his previous accountant,
Alan Helfer, who is HELFER'S brother.  HELFER called Dey and
presented him with various investment opportunities. When Dey
agreed to invest in an opportunity, HELFER provided instructions
on where Dey was to wire funds. Dey told me that he entered into
six short-term financing transactions with PACHECO and has
loaned funds to PACHECO once, always through HELFER, as opposed
to directly with PACHECO. Dey did not receive any documents from
HELFER at the time any of the financing transactions occurred.
All the financing transactions were based on oral agreements and
never in writing.  The only transaction that was documented and
secured was the last one.  On April 6, 2018, PACHECO signed a
promissory note to borrow $1.5 million from the Dey Investment
Group, Inc.  PACHECO executed a deed of trust to collateralize
the loan with a real property PACHECO owned in Indio,
California.

a.  According to Dey, HELFER created documents in
response to a grand jury subpoena served on Dey for records of
transactions with PACHECO.  The documents produced by HELFER
represented that from 2016 through 2020, Dey, along with other
un-named parties, provided a series of undocumented and
unsecured loans to PACHECO.  The loans, referred to by Dey as

short-term financing transactions, were often repaid by PACHECO
with little or no interest or fees to the lenders, then the
lenders would immediately return the funds back to PACHECO,
purportedly for new, undocumented loans.  Through my
investigation, I believe these loans were a way to keep
PACHECO's money out of the reach of IRS collection. I found
through bank records that the un-named co-lenders included
Brandon Helfer, and a company called the Bahlo Nee Group, Inc.
I know from tax records that Brandon Helfer is HELFER's adult
son.  Bahlo Nee Group, Inc. was incorporated by HELFER on May
29, 2014, with the California Secretary of State per records I
reviewed.

> D. <u>Further movement of PACHECO's money to HELFER's
> IOLTA and 3rd parties, out of the reach of the IRS</u>

23.  Based on bank records, I know that on June 13, 2016,

a.   PACHECO wired $1,100,000 from the Chuck Pacheco
Corporation account at Wells Fargo ending 8602 to HELFER's IOLTA
account at Wells Fargo Bank ending 1241.

b.   PACHECO wired $8,130,334 from the Chuck Pacheco
Corporation account at Wells Fargo ending 8602 to an individual
named Alec Gores (Gores).  Based on representations and
documents provided by HELFER to the IRS and First Republic Bank
that I reviewed, I know Alex Gores to be a gambling associate of
PACHECO.

c.   During the three-month period from April to June
2016, PACHECO dispersed more funds from his personal accounts to
pay for artwork and Gores than the total amount of tax he owed.

24.  From my review of bank records, I know that PACHECO continued throughout 2016 to move his money outside the reach of the IRS, as follows:

a.  On September 13, 2016, PACHECO wired $750,000 from his personal account at First Republic Bank ending 0493 to HELFER's Wells Fargo IOLTA account ending 1241.

b.  On September 15, 2016, PACHECO wired $935,000 from his Wells Fargo personal account ending 0826 to HELFER's Wells Fargo IOLTA account ending 1241.

c.  On December 13, 2016, PACHECO wired $720,000 from his personal account at Wells Fargo ending 0826 to HELFER's Wells Fargo IOLTA account ending 1241.

25.  In apparent attempts to obfuscate the purpose of transactions, or lack thereof, HELFER dispersed funds from his attorney-client trust accounts, often moving funds with no apparent purpose.  Per my review of bank records, I know that during the period from 2016 through 2020, PACHECO moved funds to HELFER in a common pattern.  When PACHECO received a large amount of money into his personal bank accounts, shortly thereafter, often within a few days, he dispersed the majority of the funds to HELFER and/ or his gambling associates. HELFER moved the funds through various accounts under his control and influence, such as the accounts of Brandon Helfer, Bahlo Nee Group, Inc., and various accounts controlled by Dey before HELFER either returned funds to PACHECO or moved them outside of the United States.  Usually, when PACHECO received funds back from HELFER, he quickly disbursed them from his account to pay

his debts at casinos or with gambling associates, buy art, or pay his American Express credit card bills.

      a.   Based on what I learned through this investigation, I believe that PACHECO and HELFER were moving PACHECO's money in this manner to avoid IRS levies on PACHECO's accounts. I know from my training and experience that the IRS can place a levy on a financial account to legally seize money to satisfy a tax debt owed the IRS. Once the IRS serves a levy, the levy attaches to the property in the bank account only at the close of business on the date the levy is received by the bank. The levy does not affect funds added to a bank account after the date of the levy. There is also a 21-day waiting period for the bank to comply with the levy and turn over the funds in an account on the date/time of the levy, afforded to taxpayers so they can contact the IRS and come to an agreement pertaining to their outstanding liability.

      b.   As an example of the avoidance of the IRS's collection efforts, based on my review of documents provided by E*Trade Securities LLC, Wells Fargo, Bank of America, and Merrill Lynch, I know the following:

      i.   On September 15, 2016, PACHECO wired $935,000 from his Wells Fargo personal account ending 0826 to HELFER's Wells Fargo IOLTA account ending 1241. The source of the funds was a $1 million withdrawal from PACHECO's E*Trade account ending 2429, that, based on records from E*Trade I reviewed, PACHECO stated was needed for a real estate purchase.

ii.   After receiving the funds, on September 15, 2016, HELFER moved the $935,000 from his Wells Fargo IOLTA account ending 1241 into four different accounts under his control and/or influence by issuing the following checks, all of which I reviewed, along with associated bank statements and signature cards:

(I)   $75,000 by check #8169 made payable to Dey Investment Group.

(II)  $112,500 by check #8170 made payable to Brandon Helfer that was deposited into Brandon Helfer's personal Merrill Lynch account ending 4316.

(III)   $350,000 by check #8171 payable to Bahlo Nee Group Trust with its Merrill Lynch account ending 3815.

(IV)  $300,000 by check #8172 made payable to "Jeffrey Helfer Agreement of Trust[5]" deposited into a Merrill Lynch account ending in 10793 in the same name.

(V)   $50,000 by check #8173 made payable to the Bahlo Nee Group Trust. The Bahlo Nee Group Trust Account at Merrill Lynch was opened on July 9, 2014 with Brandon Helfer listed as the Trustee who, on that same day, granted power of attorney for the account to his father, HELFER.

---

[5] The "Jeffrey Helfer Agreement of Trust" account at Merrill Lynch was opened on October 24, 2008. Jeffrey Helfer and Scott Venturelli are the listed Trustees. Jeffrey Helfer is the sole beneficial owner of the account.

(VI) $47,500 by check #8174 made payable to the "Jeffrey Helfer Agreement of Trust" account at Merrill Lynch ending in 10793.

iii. A few days later, on October 3, 2016, based on my review of the account records, checks and statements for the following accounts, HELFER returned $1.5 million to PACHECO as follows:

(I)  HELFER wired $700,000 from Bahlo Nee Group Trust account at Merrill Lynch ending 3815 to his IOLTA account with Wells Fargo ending 1241.

(II) HELFER wired $700,000 from the "Jeffrey Helfer Agreement Trust" account at Merrill Lynch ending in 10793 to his IOLTA account with Wells Fargo ending 1241.

(III)   Brandon HELFER wired $150,00 from his account at Merrill Lynch ending in 4316 to HELFER's IOLTA account with Wells Fargo ending 1241.

(IV) Then, HELFER wired $1,500,000 from his IOLTA account with Wells Fargo ending 1241 to PACHECO's personal account with Wells Fargo ending 0826.

iv.  Thereafter, PACHECO dispersed the $1.5 million received from HELFER on October 3, 2016 as follows:

(I)  On October 5, 2016, PACHECO wired $1,100,000 from his personal account at Wells Fargo ending 0826 to an individual named Bosko Djordjevic[6], and

---

[6] I know from open-source searches that there is a Bosko Djordjevic who is a film Director & Cinematographer who participated in high stakes poker games.

(II) On October 7, 2016, PACHECO wired $950,000 from his account with Wells Fargo ending 0826 to the Bellagio Casino in Las Vegas, Nevada.

26.   PACHECO and HELFER continued to avoid paying PACHECO's 2014 tax liability as follows:

a.   I know from a review of Murphy's collection files and her ICS History that, at a meeting on February 2, 2017, Murphy told HELFER that she would file liens on February 8, 2017, which under Title 26, would attach to PACHECO's property and interest as of that date.

b.   I know from escrow records that on February 3, 2017, PACHECO sold his condominium on the Las Vegas Strip for $1.1 million.  On February 3, 2017, PACHECO received $1,025,579 from Equity Title from this sale into his Wells Fargo personal account ending in 0826.

c.   Per bank records I reviewed, on that same day, PACHECO made multiple transfers from his Wells Fargo personal account ending in 0826 as follows:

i.   $6,000 to a Wells Fargo account for business he owns called Virgil SB123,[7]

ii.   $10,000 to the Chuck Pacheco Corporation Wells Fargo account ending in 8602, and

iii. $98,000 to the Wells Fargo account of Nine Nights All Star Weekend, LLC ending in 8537.

---

[7] The Virgil SB123, LLC account at Wells Fargo ending in 8610 was opened on October 8, 2015. Per the bank signature card, Charles Pacheco is the owner and sole signer on the account.

iv.   PACHECO also made an ACH payment to American Express for his account ending 4-34009 in the amount of $93,083.99.

d.   Four days later, on February 7, 2017, PACHECO transferred an additional $40,000 from his Wells Fargo personal account ending in 0826 to his personal account at the First Republic Bank ending in 0493.  Then, on February 7, 2017, PACHECO purchased a cashier's check for $275,300 from Wells Fargo payable to an individual named Sam Magid. From reviewing records that HELFER provided to the IRS, I believe Magid is a gambling associate of PACHECO.

27.  I know from the ICS History that on February 13, 2017, Murphy sent HELFER, as PACHECO's authorized representative, a final notice of the IRS's intent to levy.  Based on my training and experience, under Title 26, the IRS is required to send such a notice at least 30 days before levying any source of income to satisfy an outstanding tax liability.  Therefore, Murphy could not levy any income source of PACHECO's to satisfy the 2014 outstanding liability before on or about March 13, 2017.

a.   Based on my review of wire detail and Wells Fargo bank records, I know the following transfers were made between the accounts of PACHECO and HELFER soon after learning of Murphy's intent to levy, then sending the money back to PACHECO into his corporate account (which is not subject to the IRS's levy), or in parts to PACHECO's personal account, as demonstrated below:

| Date | Amount | Wire Originated | Wire Destination |
|------|--------|-----------------|------------------|
| 2/24/17 | $1,331,000 | PACHECO Wells Fargo ending 0826 | HELFER's Wells Fargo IOLTA ending 1241[8] |
| 2/28/17 | $625,000 | HELFER's Wells Fargo IOLTA ending 1241 | Chuck PACHECO Incorporated Wells Fargo ending 8602 |
| 3/6/17 | $100,000 | HELFER's Wells Fargo IOLTA ending 1241 | PACHECO Wells Fargo ending 0826 |
| 3/7/17 | $500,000 | HELFER's Wells Fargo IOLTA ending 1241 | PACHECO Wells Fargo ending 0826 |
| 3/14/17 | $300,000 | HELFER's Wells Fargo IOLTA ending 1241 | PACHECO Wells Fargo ending 0826 |
| 4/4/17 | $175,000 | HELFER's Wells Fargo IOLTA ending 1241 | PACHECO Wells Fargo ending 0826 |

b.   Based on my review of the ICS History, on April 18, 2017, during a phone call, HELFER stated to Murphy that PACHECO "had a bad year in 2016 and has no money." However, per

---

[8] Based on my review of the bank records, I know that HELFER's IOLTA account with First Republic Bank ending 2629 was opened in January 2017 but was unused until a series of transactions of funds from PACHECO in June 2017. The account was used one more time in October 2017 to move funds for PACHECO and then was not used again through July 2020, which is most recent date records for the account were obtained in the investigation.

Wells Fargo bank records obtained in the course of this investigation that I reviewed and detailed in the chart above, during the period from February 28, 2017, to April 4, 2017, which was only two weeks before the aforementioned statement by HELFER, approximately $1.7 million was transferred from HELFER's IOLTA account at Wells Fargo ending in 1241 to the Wells Fargo accounts of PACHECO and the Chuck Pacheco Corporation.

c.    Per records I obtained and reviewed from Wells Fargo and First Republic Bank, on April 21, 2017, a few days after his call with Murphy, HELFER wired $1.8 million from his IOLTA account with Wells Fargo ending 1241 to PACHECO's personal account with Wells Fargo ending 0826.

d.    Then, on April 24, 2017, HELFER wired an additional $1.2 million from his IOLTA account with Wells Fargo ending 1241 to PACHECO's personal account with Wells Fargo ending 0826. In a second transaction on the same day, HELFER wired one million from his IOLTA account ending 1241 to PACHECO's personal account at First Republic Bank ending in 0493.

e.    On May 16, 2017, HELFER wired $4 million from his IOLTA account with Wells Fargo ending 1241 to PACHECO's personal account with Wells Fargo ending 0826.

f.    During the period between April 24, 2017 and May 30, 2017, PACHECO made disbursements from his personal account at Wells Fargo ending in 0826 including but not limited to:

    i. On April 24, 2017, PACHECO wired $1,653,000 to a company named RSTT, Inc.[9]

    ii. On April 28, 2017, PACHECO wired $469,000 to the Bellagio Casino in Las Vegas, Nevada.

    iii. On May 1, 2017, PACHECO issued check #1195 to Sam Magid for $110,000.

    iv. On May 17, 2017, PACHECO wired $2 million to an individual named Alec Gores.

    v. On May 17, 2017, PACHECO wired $350,000 to Whittington Motor Sports.

    vi. On May 18, 2017, PACHECO issued check #1199 for $939,000 to the Aria Resort and Casino in Las Vegas, Nevada.

    vii. On May 22, 2017, PACHECO wired $500,000 to Alec Gores.

  28. Finally, on May 30, 2017, Murphy issued levies for all of PACHECO's personal accounts known to her at the time to satisfy PACHECO's 2014 outstanding tax liability.  On June 5, 2017, PACHECO's Wells Fargo account ending in 0826 was debited for a "Legal Order Debit" in the amount of $1,001.27.  Murphy received this payment from Wells Fargo in early July.  Pursuant to the IRS levies, Murphy also received $2,178.45 from the JP Morgan Chase Bank account ending in 4048 and $1,571.90 from the Bank of America account ending in 8145 held in PACHECO's name.  Murphy also received $1,442.63 from the Bank of America account

---

  [9] Per tax and California Secretary of State records I reviewed, this company was owned by Richard Salomon. Per records provided by HELFER to the IRS that I reviewed, Salomon used this company pertaining to gambling with PACHECO.

ending in 5227 which was a joint checking account held in the names of Rosa I.[10] and Charles M. PACHECO.

### E. Movement of PACHECO's Funds Overseas

29.   Right after Murphy levied PACHECO's accounts, based on my review of bank records, PACHECO transferred money to HELFER that HELFER wired overseas. In June 2017, PACHECO received money from different sources that he transferred to HELFER, who wired the money outside the United States, as follows:

---

[10] Based on my knowledge of the investigation, I believe this is PACHECO's mother.

| Date | Amount | Wire Originated | Wire Destination |
|------|--------|-----------------|------------------|
| 6/13/17 | $591,000 | ASL, LLC | PACHECO First Republic Bank ending 0493 |
| 6/14/17 | $500,000 | PACHECO's First Republic Bank account ending 0493 | HELFER's First Republic Bank IOLTA Account ending 2629 |
| 6/15/17 | $500,000 | HELFER's First Republic Bank IOLTA Account ending 2629 | HELFER's Wells Fargo IOLTA Account ending 1241 |
| 6/15/17 | $986,000 | RSTT, Inc. | PACHECO's First Republic Bank account ending 0493 |
| 6/16/17 | $500,000 | PACHECO First Republic Bank ending 0493 | HELFER's First Republic Bank IOLTA Account ending 2629 |
| 6/16/17 | $500,000 | HELFER's First Republic Bank IOLTA Account ending 2629 | HELFER's Wells Fargo IOLTA Account ending 1241 |
| 6/16/17 | $500,000 | Nine Nights Priceless Productions LLC[11] | PACHECO Wells Fargo ending 0826 |
| 6/16/17 | $500,000 | PACHECO Wells Fargo ending 0826 | HELFER's Wells Fargo IOLTA Account ending 1241 |
| 6/19/17 | $849,900 | ASL, LLC[12] | PACHECO First Republic Bank ending 0493 |
| 6/20/17 | $858,826 | PACHECO First Republic Bank ending 0493 | HELFER's First Republic Bank IOLTA Account ending 2629 |
| 6/21/17 | $858,000 | HELFER's First Republic Bank IOLTA Account ending 2629 | HELFER's Wells Fargo IOLTA Account ending 1241 |

[11] According to California Secretary of State records I reviewed, Nine Nights Priceless Productions LLC was formed by HELFER on March 14, 2017, and on March 7, 2018, PACHECO was added as the manager and CEO, with HELFER as the agent for service of process. According to a certificate of cancellation filed on March 11, 2019, PACHECO terminated this LLC.

[12] Per tax and Texas Secretary of State records I reviewed, this company was owned by Andrew Beal. Per records provided by HELFER to the IRS, Beal used this company to conduct gambling transactions with PACHECO.

a.   Based on my review of the bank statements pertaining to HELFER's Wells Fargo IOLTA account ending 1241, I know that on June 20, 2017, HELFER wired $1,050,000 to an account in the name of "New Lotus Investments" with the Bank of China in Macau, China.

b.   I also know that on June 26, 2017, HELFER wired $575,000 from his Wells Fargo IOLTA account ending 1241 to accounts in Singapore with DBS Bank and Macau, China in the name of Christopher Patrick Milligan.  I know from my interview of Dey that Milligan is a client of HELFER.  Based on an internet search and a LinkedIn page in his name, Milligan is a Principal of Alegra Capital Pte. Ltd., a holding company in Singapore.

c.   In addition, on that date, HELFER sent $294,000 to an individual named Joao Miguel Barros to his account with Banco Commercial De Macau in Macau, China.  According to a LinkedIn page in his name, Barros is a lawyer based in Lisbon, Portugal, and Macau, China.

d.   When PACHECO wired the funds either directly to HELFER's Wells Fargo IOLTA account ending 1241 or indirectly into HELFER's First Republic Bank IOLTA account ending 2629, funds from other sources were on deposit in account ending 1241, so that PACHECO's money was comingled with funds from Cavanaugh Investment Group.  Cavanaugh Investment Group (CIG), is a real estate holding company owned by Dey.

e.   On July 24, 2017, HELFER wired $1,050,000 from his Wells Fargo IOLTA account ending 1241 to New Lotus Investments in Macau, China.

f.    On September 19, 2017, HELFER wired $1,048,500 from his Wells Fargo IOLTA account ending 1241 to New Lotus Investments.

g.    As seen by the transactions above, PACHECO transferred funds into HELFER's IOLTA account, and HELFER wired the funds to others abroad. Based on my training and experience and what I know thus far in my investigation, I believe that this was another method used by PACHECO and HELFER to keep PACHECO's funds outside the reach of the government.

F. 2017-2018 transfers between PACHECO and HELFER

30.  The pattern of transfers between PACHECO and HELFER through his IOLTA account continued throughout 2017 and into 2018.  Based on bank records, I know the following transfers occurred:

| Date | Amount | Wire Originated | Wire Destination |
|------|--------|-----------------|------------------|
| 09/29/17 | $1,801,750 | ASL, LLC | PACHECO personal First Republic Bank ending 0493 |
| 10/2/17 | $1,800,000 | PACHECO personal First Republic Bank ending 0493 | HELFER's Wells Fargo IOLTA ending 1241 |
| 10/3/17 | $800,000 | PACHECO personal Wells Fargo ending 0826 | HELFER's Wells Fargo IOLTA ending 1241 |
| 10/4/17 | $6,200,000 | RSTT, Inc. | Chuck Pacheco Inc. Wells Fargo ending 8602 |
| 10/4/17 | $6,200,000 | Chuck Pacheco Inc. Wells Fargo ending 8602 | HELFER's Wells Fargo IOLTA ending 1241 |
| 10/20/17 | $1,420,000 | Kevin Washington | Chuck Pacheco Inc. Wells Fargo ending 8602 |

| Date | Amount | Wire Originated | Wire Destination |
|---|---|---|---|
| 10/23/2017 | $    500<br>$265,000<br>$700,000<br>$500,000 | Chuck Pacheco Inc.<br>Wells Fargo ending<br>8602 | PACHECO personal<br>Wells Fargo<br>ending 0826 |
| 10/23/17 | $265,000 | PACHECO personal<br>Wells Fargo ending<br>0826 | HELFER's Wells<br>Fargo IOLTA<br>ending 1241 |
| 10/23/17 | $1,200,000 | PACHECO personal<br>Wells Fargo ending<br>0826 | RSTT, Inc. |
| 11/6/17 | $100,000 | HELFER's Wells<br>Fargo IOLTA ending<br>1241 | All-Star Weekend<br>First Republic<br>Bank<br>Ending 0527 |
| 11/6/17 | $100,000 | HELFER's Wells<br>Fargo IOLTA ending<br>1241 | PACHECO personal<br>Wells Fargo<br>ending 0826 |
| 1/3/18 | $325,000 | HELFER's Wells<br>Fargo IOLTA ending<br>1241 | PACHECO personal<br>Wells Fargo<br>ending 0826 |
| 1/3/18 | $254,676.94 | PACHECO personal<br>Wells Fargo ending<br>0826 | American Express<br>for account<br>ending in 4-<br>34009 |
| 2/26/18 | $1,477,300 | ASL, LLC | PACHECO personal<br>Wells Fargo<br>ending 0826 |
| 2/27/18 | $325,000 | PACHECO personal<br>Wells Fargo ending<br>0826 | HELFER's Wells<br>Fargo IOLTA<br>ending 1241 |
| 3/19/18 | $250,000 | PACHECO personal<br>Wells Fargo ending<br>0826 | HELFER's Wells<br>Fargo IOLTA<br>ending 1241 |
| 3/26/18 | $820,996 | PACHECO personal<br>Wells Fargo ending<br>0826 | HELFER's Wells<br>Fargo IOLTA<br>ending 1241 |

31.  The above transactions are representative of the transactions between PACHECO and HELFER in 2017 and 2018, and based on my review of bank documents, similar transactions continued between PACHECO and HELFER through 2018, 2019, and 2020.

G. Through Dozens of Communications Over Three
Years, HELFER Promised Payments, Revised Tax
Returns, and Elimination of PACHECO's Tax
Liability Without Effect In Order to Delay IRS
Collection

32.   In addition to the aforementioned activity to avoid
IRS collection, HELFER, as PACHECO's authorized representative
before the IRS, tried to delay Murphy's collection efforts by
repeatedly telling Murphy that PACHECO had a large net operating
loss in 2015 that would wipe out his tax debt from 2014 once it
was "carried back."  HELFER spent years promising the Revenue
Officer that returns filed for later years would include net
operating losses that, when carried back, would result in no tax
due for 2014.  This never came to pass.

33.   From my training and experience, I know that a net
operating loss (NOL) for income tax purposes is when a company's
allowable deductions exceed the taxable income in a tax period.
Prior to 2021, when a company's deductibles were greater than
its actual income, the IRS allowed the company to use the loss
to reduce previous years' taxes or to carry it forward to offset
future years' profits.  Subsequent to 2021, net operating losses
may only be carried forward unless they relate to farming
activity.

34.   Based on my review of Murphy's ICS History for
PACHECO's 2014 tax liability, I know the following:

a.   On April 4, 2016, HELFER told Murphy that PACHECO
was a professional gambler who "had a fabulous year gambling in
2014," then lost big in 2015, and they (HELFER and PACHECO) were
in the process of preparing 2015 returns for the Chuck Pacheco

Corporation and PACHECO, as well as an amended 2014 return for PACHECO, which would claim the "carried back" loss from 2015. HELFER told Murphy that PACHECO would likely not owe taxes for 2014 once the returns were filed but if there were any balance still due it would be paid in full.  Based on that assurance, Murphy agreed to not file a tax lien and gave HELFER until May 4, 2016, to file the 2014 amended return and the 2015 original returns with the loss to carryback.

b.   On May 6, 2016, Murphy received a return voicemail from HELFER who told Murphy that he was having software problems calculating the net operating loss pertaining to PACHECO's gambling activities and may have to have another accountant prepare the return.

c.   On May 10, 2016, HELFER called Murphy again, leaving the message that he had a draft of the 2015 return and was sending the amended 2013 and 2014 returns, along with the 2015 return to a CPA friend to have them completed.  When Murphy called HELFER back, HELFER said he believed the net operating loss would be between six and seven million dollars, and that he was waiting for another Form K-1 that would add to that loss. HELFER also told Murphy that if there was a balance due after the amended return was filed, that "the taxpayer (PACHECO) has the funds to pay any balance within 30 days of notice" and would pay in full within 30 days so the lien would be unnecessary. Murphy set another deadline of May 24, 2016, for HELFER, on behalf of PACHECO, to file the original 2015 return and the

amended returns for 2013 and 2014, before she proceeded further with collection against PACHECO.

d.    Murphy again spoke with HELFER on May 25, 2016. HELFER stated that the accountant he engaged on PACHECO's behalf told him that, before they can submit the 2015 tax return claiming a carryback, PACHECO needed to amend his 2012 through 2014 Form 1040 income tax returns due to the omission of a Form K-1 from all three years' returns.  HELFER said he would provide Murphy the amended returns for 2012 through 2014 by the next day.  Murphy deferred filing a lien in this matter for an additional 60 days based on HELFER's representations.

e.    By June 3, 2016, Murphy had not received the promised returns for PACHECO from HELFER and left a message with HELFER voicing her concern.  On June 7, 2016, HELFER left a message with Murphy that he was out of the office and would be in touch later that week.  HELFER's also said that they (PACHECO/HELFER) were still waiting for a 2015 Form K-1 in order to compute the net operating loss and its effect on earlier years if used as a carryback, and that he expected to have the form by June 15.  HELFER further claimed that he thought the amended Form 1040 income tax returns for 2012 through 2014 had been submitted, but conceded that they might be at his office. Murphy moved the lien filing deadline to June 24, 2016.

f.    On June 10, 2016, Murphy again left a message with HELFER asking for the amended returns for 2012, 2013 and 2014.  HELFER returned the call on June 13, 2016, saying he would send the amended returns later in the week.  Then on June

17, 2016, HELFER left another message for Murphy stating the
accountant found more items to be addressed prior to completing
the returns, and that he hoped they would be done the next week.

      g.   On June 24, 2016, HELFER and Murphy spoke on the
telephone, with HELFER saying that the accountant who prepared
the return for a restaurant PACHECO owns just finished that
return, and HELFER was going to retrieve and deliver it to a
different accountant preparing the net operating loss returns,
and that he hoped to have this completed by July 1, 2016.
Murphy and HELFER spoke again on July 8, 2016, with HELFER
telling Murphy that "they almost had the return finished when
[PACHECO] remembered he had another LLC that is a movie making
business that sustained a very large loss for 2015." HELFER
assured Murphy that the loss was over $1.5 million and once the
returns were filed and the net operating loss carried back,
PACHECO would have no balance due for his 2014 income tax
liability. Murphy explained to HELFER that it was important to
have liens filed with this case, in view of the large liability,
and HELFER said the 2015 personal income tax return and amended
personal income tax returns with net operating loss carrybacks
would be filed no later than July 31, 2016. Murphy deferred the
lien filing to August 4, 2016.

      h.   On July 29, 2016, Murphy received a voicemail
from HELFER stating he was going out of the country from July 30
through August 6, 2016, the accountant had dropped off the
completed returns, and HELFER wanted to review them and get them
to Murphy. HELFER said he would return to his office on August

8, 2016. Murphy returned the call and left him a message asking
if she could pick the returns up from HELFER's office on August
9 or August 12, 2016.  On August 8, 2016, Murphy received a call
from HELFER's secretary telling Murphy that HELFER was out of
the country, now until August 12, 2016.  On August 15, 2016,
Murphy called HELFER's office and was told the office had not
yet heard from him.  The same day, HELFER returned Murphy's call
after Murphy had left for the day, saying he was only in town
for one day, to return again on August 22, 2016, and he could
have the returns ready for pick up or could mail them to Murphy,
but did not make any decision as to what to do with the returns.
On August 22, 2016, HELFER's secretary told Murphy the returns
were being sent to her that day.  The amended 2012 through 2014
Forms 1040 income tax returns and the 2015 income tax return
were received the next day.  The amended 2012 through 2014 tax
returns for PACHECO did not reflect any carryback of a net
operating loss from 2015.

          i.   On August 31, 2016, Murphy spoke with HELFER who
promised he was reviewing returns for PACHECO that claimed a net
operating loss and/or carryback and he would submit such to
Murphy by September 7, 2016.  Murphy called HELFER on September
8, 2016, and was told he was out of the office until September
10, 2016.

          j.   On September 16, 2016, Murphy spoke with HELFER,
who stated he was sending the forms and amended returns showing
the net operating loss to her that day and would be out of the

country the following week, but wanted to discuss the matter the week after that.

k.    On September 21, 2016, Murphy, having not received the forms and amended returns HELFER stated he was sending on the 16th, called HELFER's office.  Murphy was told HELFER was out of the office until September 26, 2016.

l.    On September 28, 2016, Murphy received a FedEx package from HELFER containing an IRS Form 1045, Application for Tentative Refund, for PACHECO for the 2015 income tax year, along with revised, second amended income tax returns for PACHECO for 2013 and 2014.  The 2015 Form 1045 claimed a net operating loss to be carried back to offset income from 2013 and 2014.  However, even with the carried back losses, the 2015 form 1045 showed PACHECO's tax liability for 2014 remained at more than $5 million.  Thereafter, Murphy called HELFER on September 30, 2016, to ask about the large balance shown on the form 1045.  HELFER said he did not have the returns in front of him and deferred speaking about it until a later time.  Murphy received a call from HELFER on October 7, 2016, while he was driving to his office.  HELFER stated he would call Murphy when he reached his office at approximately 10:00 a.m.  When Murphy asked why there was such a large balance still due, HELFER lost cell reception and failed to call back at the appointed time.  When Murphy called HELFER's office at 10:45 a.m., HELFER's assistant told her HELFER was out of the office at a meeting.

m.    Later that day, HELFER responded with a phone call saying that he was meeting with PACHECO the following week

and PACHECO would send in a voluntary payment.  HELFER told Murphy that if the IRS filed a lien against PACHECO, such action would destroy PACHECO'S business opportunities, and without taking that action, PACHECO should be able to pay the balance in 60 days.

n.   On October 31, 2016, Murphy and HELFER spoke and HELFER promised PACHECO would make a payment to the IRS with funds he was set to receive from the refinancing of property with First Republic Bank.

o.   On November 16, 2016, HELFER left a message for Murphy that he was meeting with PACHECO the next day and the refinancing loan had been delayed.

p.   HELFER's statement that PACHECO's refinancing was delayed was untrue; per First Republic Bank records I reviewed, twelve days prior, on November 4, 2016, PACHECO received a loan of $1,025,662.32 that was deposited into PACHECO's personal account ending in 0493.

q.   On November 18, 2016, HELFER left Murphy a message that PACHECO would be sending a check the following week.

r.   On November 21, 2016, HELFER left a message for Murphy stating that he was sending a check that day.

s.   On December 2, 2016, HELFER again left a message for Murphy stating that payment from PACHECO was forthcoming, but Murphy never received it.

t.   On December 20, 2016, HELFER claimed to Murphy he had sent a payment for PACHECO, but it must have been sent to

the wrong office, thus, he would stop payment on that check and
issue a new one.  HELFER also claimed that he had received
correspondence from the IRS that PACHECO needed to resubmit the
net operating loss claim to the IRS.

     u.   Still having received no payment, Murphy called
HELFER on January 19, 2017, and was told HELFER was out of the
country until January 26, 2017.

     v.   On February 2, 2017, Murphy and HELFER met at his
office.  The purpose of the meeting was to discuss payment of
PACHECO's outstanding 2014 personal tax liability.  HELFER said
that PACHECO had "another really bad year in 2016" and the
resulting loss would wipe out his tax debt. At their meeting,
Murphy asked for PACHECO's current address and HELFER said he
did not have it, nor did he have financial information for
PACHECO.  They concluded the meeting giving HELFER a deadline of
February 7, 2017, to file PACHECO's 2016 personal income tax
return.  In addition, Murphy again requested in writing that
PACHECO, through HELFER, provide IRS Form 433-A, a Collection
Information Statement.  On February 22, 2017, HELFER called
Murphy and said the accountant should have the 2016 return and
the revised amended returns for prior years showing a loss
carryback from 2016, within a few weeks.

     w.   On April 18, 2017, HELFER and Murphy spoke again.
HELFER stated the accountant would now have the returns done
within 2 more weeks.  HELFER also told Murphy that PACHECO had a
bad year in 2016 and no money.  I know from bank records
obtained in the course of this investigation that between

February 28 and April 4, 2017, approximately $1.7 million was transferred from HELFER's attorney-client trust account at Wells Fargo ending in 1241 to accounts at Wells Fargo in the name of PACHECO and the Chuck Pacheco Corporation.  Murphy again provided HELFER with a written request to provide an IRS Form 433-A, a Collection Information Statement, for PACHECO.

       x.   On May 1, 2017, HELFER called Murphy and asked for an extension to May 5 to produce the Form 433-A containing PACHECO's financial information.  Murphy granted that request.  On May 11, 2017, HELFER called again and said he was waiting for the 2016 return from the accountant and that he had PACHECO's financial information but wanted "to send it all together."  The 2016 return for PACHECO was received on May 25, 2017; however, the Form 433-A with PACHECO's financial information was not provided until April 7, 2020, nearly three years later.

       y.   On May 30, 2017, IRS Revenue Officer Murphy issued levies on all known bank accounts held in PACHECO's name. Murphy continued issuing levies on PACHECO's accounts throughout the remainder of 2017, collecting small amounts from PACHECO's financial institutions.

       z.   The IRS continued to place levies on PACHECO's known accounts and garnish his wages throughout 2018, but got little to satisfy PACHECO's tax debt. Beginning in June 2018, Murphy started to investigate the real properties owned by PACHECO for potential sources of funds to obtain by seizure to satisfy PACHECO's outstanding tax liability.

### H. <u>PACHECO's False Statements on Form 433-A</u>

35. Murphy retired from the IRS in April 2019, and
PACHECO's collection case was transferred to Revenue Officer
Jose Ochoa ("Ochoa").

a.   On July 1, 2019, Ochoa sent PACHECO and HELFER an
IRS Letter 3174, an enforcement action used to provide a
refresher to taxpayers when a substantial amount of time passed
since a notice of intent to levy was issued by the IRS.  Ochoa
also requested an updated IRS Form 2848, Power of Attorney, from
HELFER, so HELFER could continue to represent PACHECO before the
IRS.

b.   Having not received an updated Power of Attorney
from HELFER for months after requesting it, on March 13, 2020,
Ochoa went to PACHECO's residence unannounced, and spoke with
PACHECO.  In sum, PACHECO told Ochoa he would apply for a
payment plan to pay his outstanding tax debt and referred Ochoa
to HELFER.

36. On April 7, 2020, PACHECO signed under penalty of
perjury and submitted an IRS Form 433-A, Collection Information
Statement, to the IRS through HELFER by FedEx delivery.  With
the package was a cover letter signed by HELFER.

a.   The Form 433-A required PACHECO to list his
assets:

i.   PACHECO stated that he had a total of $5,500
in his bank accounts, and $108,000 in his E*Trade account.

      ii.   PACHECO stated that the Chuck Pacheco Corporation was worth $0 and his restaurant, held under the name Virgil SB123, was worth $200,000.

      iii. Line 14c of this form required PACHECO to list any ownership of virtual currency, PACHECO responded "N/A." Based on PACHECO's Coinbase transaction history, I know that PACHECO conducted transactions with virtual currency throughout 2017, 2018, 2019, and 2020.  PACHECO received virtual currency into his Coinbase account on March 26, 2020, and sent some to other parties on March 31, April 8, and April 27, 2020.

      iv.   Line 18a required PACHECO to disclose any vehicles leased or owned, to which PACHECO responded, "No owned or leased automobiles." I know from review of car leases that at the time, PACHECO had two leased Bentley automobiles.

      v.   Line 19a required PACHECO to list all personal assets, including artwork. PACHECO listed $250,000 worth of "misc furniture/personal effects."  Based on the information delineated above, and other records I reviewed in this investigation, PACHECO purchased over $5 million of artwork from Sotheby's, Inc. in 2016 and 2018.  PACHECO also purchased over $4 million of artwork from Christies, Inc. during 2016, 2017, and 2020.

**4. <u>Use of Email between PACHECO and HELFER</u>**

      A. <u>PROVIDER-1 and SUBJECT ACCOUNT-1</u>

  37.  In the course of the investigation, the government obtained an order from the Court pursuant to 18 U.S.C. § 2703(d), from the information which I reviewed:

a.   I know from account profile information obtained from PROVIDER-1, that the display name associated with SUBJECT ACCOUNT-1 is "Chuck Pacheco". Furthermore, the profile information for SUBJECT ACCOUNT-1 includes the phone number, "310.775.8623" which matches the work phone number provided for PACHECO on the signature card for an account in the name of Charles PACHECO at First Republic Bank ending in 0493.

b.   PROVIDER-1 provided the government over 13,000 records of headers of SUBJECT ACCOUNT-1 being used by PACHECO from December 2013 through August 2020.

c.   I reviewed signature cards for First Republic Bank accounts in the name of PACHECO (account ending in 0493) and Nine Nights Allstar Weekend, LLC (account ending in 0527) on which PACHECO provided SUBJECT ACCOUNT-1 as his email address. PACHECO signed and dated both signature cards on April 18, 2016.

d.   I reviewed an email dated December 24, 2020, where PACHECO wrote to a representative of First Republic Bank regarding his mortgage payments using SUBJECT ACCOUNT-1.

B. PROVIDER-2 and SUBJECT ACCOUNT-2

38.  I know the following regarding SUBJECT ACCOUNT-2 from information obtained from PROVIDER-2 by grand jury subpoena,

a.   SUBJECT ACCOUNT-2 was registered on March 30, 1999, in the name of "Charles Pacheco". I also know that the recovery email address for SUBJECT ACCOUNT-2 is the address of SUBJECT ACCOUNT-1 and the recovery phone number of 323-350-5400, matches the cell number for PACHECO as shown on the signature

card for the account of the Chuck Pacheco Corporation at First
Republic Bank ending in 1291.

  b.   I received a login activity summary from
PROVIDER-2 that shows PACHECO accessed SUBJECT ACCOUNT-2 from
June 9, 2022 through June 9, 2023 on a nearly daily basis and
often multiple times a day.

  39.   I reviewed a broker interaction log obtained from
E*Trade wherein it is noted that E*Trade sent multiple email
communications to SUBJECT ACCOUNT-2 from November 4, 2014,
through January 20, 2016. On January 20, 2016, PACHECO updated
his primary email address on file with E*Trade to SUBJECT
ACCOUNT-1.

  40.   I reviewed an email dated June 18, 2020 where HELFER
forwarded an email with copies of individual and corporate
income tax returns for 2017 and 2018 for PACHECO and the Chuck
Pacheco Corporation to PACHECO at SUBJECT ACCOUNT-2.

  41.   I reviewed an email dated August 4, 2020 where PACHECO
used SUBJECT ACCOUNT-2 to email HELFER and an individual named
Garrett Mitton with the subject as "Re: Pacheco Taxes".

  42.   I reviewed an email dated June 2, 2021, where PACHECO
used at SUBJECT ACCOUNT-2 to request loan documents from an
individual named Garrett Mitton for PACHECO's "current tax
audit."

          C. E-Mail Communication between PACHECO and HELFER
             using SUBJECT ACCOUNTS 1 and 2

  43.   I know from my review of records provided by PACHECO's
lenders and return preparer that PACHECO and HELFER corresponded

using email to exchange information on topics including PACHECO's tax returns, outstanding liabilities, and his finances. I also know that for this correspondence HELFER used an email account with the suffix "@helferlawfirm.com". For example:

a.    I reviewed an email dated October 7, 2016, where HELFER sent an email to PACHECO and representatives of First Republic Bank pertaining to PACHECO's mortgage payments.  The email address used by PACHECO on that occasion was SUBJECT ACCOUNT-1.

b.    As noted above, I reviewed emails dated on August 3 and 4, 2020, wherein PACHECO wrote to HELFER and Garrett Mitton regarding his tax audit using SUBJECT ACCOUNT-2.

c.    In order to prepare PACHECO's tax returns, HELFER provided copies of email correspondence between himself and PACHECO to an individual named, Jordan Bass, CPA, JD (Bass). I interviewed Bass on June 1, 2021, and Bass informed me that he was soon to be HELFER's son-in-law as he was engaged to HELFER's daughter.  Per copies of the email correspondence provided to me by Bass, on October 11, 2020, PACHECO forwarded an email to HELFER regarding PACHECO's virtual currency transactions.  The email address used by PACHECO on October 11, 2020, was SUBJECT ACCOUNT-2.

d.    I also reviewed email header information obtained from PROVIDER-1 and found multiple email communications between SUBJECT ACCOUNT-1 and various email accounts with the suffix "@helferlawfirm.com" during the period from 2013 through

August 2020, including an email from Kellie@helferlawfirm.com to
SUBJECT ACCOUNT-1 on April 21, 2016, approximately two weeks
after IRS Revenue Officer Murphy contacted HELFER about
PACHECO'S personal tax liability.

44.  Other than what has been described herein, to my
knowledge the United States has not attempted to obtain the
contents of SUBJECT ACCOUNT-1 or SUBJECT ACCOUNT-2 by other
means.

**5. Meeting with PACHECO's attorney**

45.  On August 4, 2022, PACHECO's attorney, Nathan Hochman
gave a presentation to me and the Assistant United States
Attorney assigned to this investigation.  During his
presentation Hochman stated that I, as the investigating agent,
may have seen emails and text messages from PACHECO indicating
he does not want to pay his tax liabilities to the IRS, he
wanted to pay everyone but the IRS, and that he wanted to hide
funds out of his name.

**6. Time Period Limitation Explained**

46.  As seen in Attachments B-1 and B-2, the government
requests that PROVIDERS 1 and 2 disclose "all contents of all
wire and electronic communications associated with the SUBJECT
ACCOUNTS, limited to that which occurred between January 1, 2015
through October 11, 2020.  The government has limited the
production to these dates, as follows:

a.  The starting date is chosen to correspond to the
end of 2014, the year of the tax liability at issue, and the

first date that a tax return could be prepared for 2014 which
was January 1, 2015, and

      b.   The end date, October 11, 2020, is the date where
PACHECO forwarded an email to HELFER regarding PACHECO's virtual
currency transactions using SUBJECT ACCOUNT-2.  As noted above,
Line 14c of IRS Form 433 PACHECO submitted on April 7, 2020
required PACHECO to list any ownership of virtual currency, and
PACHECO responded "N/A."

        **V.**   **BACKGROUND ON EMAIL ACCOUNTS AND THE PROVIDERS**

    47.  In my training and experience, I have learned that
providers of email and/or social media services offer a variety
of online services to the public.  Providers, such as the
PROVIDER-1 and PROVIDER-2, allow subscribers to obtain accounts
like SUBJECT ACCOUNT-1 and SUBJECT ACCOUNT-2, respectively.
Subscribers obtain an account by registering with the provider.
During the registration process, providers generally ask their
subscribers to provide certain personal identifying information
when registering for an email or social media account.  Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative
email addresses, and, for paying subscribers, means and source
of payment (including any credit or bank account number).  Some
providers also maintain a record of changes that are made to the
information provided in subscriber records, such as to any other
email addresses or phone numbers supplied in subscriber records.
In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

48.   Therefore, the computers of PROVIDER-1 and PROVIDER-2 are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER-1 and PROVIDER-2's services, such as account access information, email or message transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

49.   A subscriber of PROVIDER-1 and PROVIDER-2 can also store with PROVIDER-1 and PROVIDER-2 files in addition to emails or other messages, such as address books, contact or buddy lists, groups, social network links, calendar data, pictures or videos (other than ones attached to emails), notes, and other files, on servers maintained and/or owned by PROVIDER-1 and PROVIDER-2.  In my training and experience, evidence of who was using an account may be found in such information.

50.   In my training and experience, email and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as

logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

51.  In my training and experience, email and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers of emails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

## VI.   BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER

52.  I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time.  Accounts may be registered in false names or

screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,
investigators often have to rely on circumstantial evidence to
show that an individual was the actual user of a particular
account.  Only by piecing together information contained in the
contents of an account may an investigator establish who the
actual user of an account was.  Often those pieces will come
from a time period before the account was used in the criminal
activity.  Limiting the scope of the search would, in some
instances, prevent the government from identifying the true user
of the account and, in other instances, may not provide a
defendant with sufficient information to identify other users of
the account.  Therefore, the contents of a given account,
including the email addresses or account identifiers and
messages sent to that account, often provides important evidence
regarding the actual user's dominion and control of that
account.  For the purpose of searching for content demonstrating
the actual user(s) of a SUBJECT ACCOUNT, I am requesting a
warrant requiring PROVIDER-1 and PROVIDER-2 to turn over all
information associated with a SUBJECT ACCOUNT with the date
restriction included in Attachments B-1 and B-2 for review by
the search team.

    53.  Relatedly, the government must be allowed to determine
whether other individuals had access to SUBJECT ACCOUNT-1 and

SUBJECT ACCOUNT-2.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

54.  I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachments B-1 and B-2, is necessary to find all relevant evidence within the account.

55.  This application seeks a warrant to search all responsive records and information under the control of the PROVIDER-1 and PROVIDER-2, which is subject to the jurisdiction

of this court, regardless of where PROVIDER-1 and PROVIDER-2 has chosen to store such information.

56.  As set forth in Attachments B-1 and B-2, I am requesting a warrant that permits the search team to keep the original production from PROVIDER-1 and PROVIDER-2, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.  I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b.  I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example,

if a defendant is incarcerated and does not (perhaps cannot)
access his or her account.  Preserving evidence, therefore,
would ensure that the government can satisfy its Brady
obligations and give the defendant access to evidence that might
be used in his or her defense.

## VII. Common Subscriber Record Information

57.  Users of accounts are often required to include an
email account as well as a phone number in subscriber records.
The email account may be an email account hosted at the same
provider, or an account at a different provider.  The email
account is referred to by a number of names, such as a secondary
email account, a recovery email account, or an alternative email
account or communication channel.  That email account is often
used when the identity of the user of the primary account (here,
a SUBJECT ACCOUNT) needs to be verified, for example if a
password is forgotten, so that the provider can confirm that the
person trying to access the account is the authorized user of
the account.  Similarly, the telephone number used in subscriber
records is often used to send a passcode via text (or "SMS")
that must be presented when trying to gain access to an account,
either in a similar scenario where a user forgot his or her
password, or when users implement what is referred to as "two-
factor authentication" (where the password is one factor, and
the passcode sent via text message to a mobile device is a
second).  In either scenario, the user of a primary email
account (a SUBJECT ACCOUNT) and a secondary email account or
phone number listed in subscriber records are very often the

same person, or at least are close and trusted and/or working in concert.  That is because access to either the secondary email account or to the phone number listed in subscriber records can allow access to the primary account.

## VIII.   <u>CONCLUSION</u>

58.  Based on the foregoing, I request that the Court issue the requested warrants.  The government will execute these warrants by serving them on PROVIDER-1 and PROVIDER-2.  Because the warrants will be served on PROVIDER-1 and PROVIDER-2, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
June, 2023.


_____
HON. CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-1**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the SUBJECT ACCOUNT-1 identified as cmp@lbient.com, that is within the possession, custody, or control of Microsoft Corporation, a company that accepts service of legal process at 1 Microsoft Way, Redmond, WA 98052, regardless of where such information is stored, held, or maintained.

## ATTACHMENT A-2

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the SUBJECT ACCOUNT-2 identified as chuckpach@aol.com, that is within the possession, custody, or control of Yahoo Inc., a company that accepts service of legal process at 1199 Coleman Avenue, San Jose, CA 95110.

1

**ATTACHMENT B-1**

**ITEMS TO BE SEIZED**

**I. SEARCH PROCEDURE INCLUDING PRIVILEGE REVIEW PROCEDURE**

1.   The search warrant will be presented to personnel of Microsoft Corporation (the "PROVIDER-1"), who will be directed to isolate the information described in Section II below.

2.   To minimize any disruption of service to third parties, the PROVIDER-1's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.   The PROVIDER-1's employees will provide the Section II information in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.   With respect to contents of wire and electronic communications produced by the PROVIDER-1 (hereafter, "content records," see Section II.13.a. below), law enforcement agents and/or other individuals assisting law enforcement agents who are not participating in the investigation of the case and who are assigned as the "Privilege Review Team" will review the content records, according to the procedures set forth herein, to determine whether or not any of the content records appears

to contain or refer to communications between Jeffrey Helfer,
Jordan Bass, Nathan Hochman or to contain the work product of
Jeffrey Helfer, Jordan Bass, Nathan Hochman, and any person
("potentially privileged information").  The "Search Team" (law
enforcement personnel conducting the investigation and search
and other individuals assisting law enforcement personnel in the
search) will review only content records which have been
released by the Privilege Review Team.  With respect to the non-
content information produced by the PROVIDER-1 (see Section
II.13.b. below), no privilege review need be performed and the
Search Team may review immediately.

5.   The Search Team will provide the Privilege Review Team
with a list of "privilege key words" to search for in the
content records, to include specific words like Jeffrey Helfer,
Jordan Bass, Law Offices of Jeffrey Helfer, and Law Offices of
Jordan Bass, Nathan Hochman, Ross LLP, their email addresses,
and generic words such as "privileged" and "work product".  The
Privilege Review Team will conduct an initial review of all of
the content records by using the privilege key words, and by
using search protocols specifically chosen to identify content
records containing potentially privileged information.  Content
records that are not identified by this initial review as
potentially privileged may be given to the Search Team.

6.   Content records that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information.  Content records determined by this review not to be potentially privileged may be given to the Search Team. Content records determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a Privilege Review Team Attorney ("PRT Attorney").  Content records identified by the PRT Attorney after review as not potentially privileged may be given to the Search Team.  If, after review, the PRT Attorney determines it to be appropriate, the PRT Attorney may apply to the court for a finding with respect to particular content records that no privilege, or an exception to the privilege, applies.  Content records that are the subject of such a finding may be given to the Search Team.  Content records identified by the PRT Attorney after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

7.   The Search Team will search only the content records that the Privilege Review Team provides to the Search Team at any step listed above in order to locate, extract and seize content records that are within the scope of the search warrant (see Section III below).  The Search Team does not have to wait

until the entire privilege review is concluded to begin its
review for content records within the scope of the search
warrant.  The Privilege Review Team may also conduct the search
for content records within the scope of the search warrant if
that is more efficient.  The search may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

    8.   The search team will not seize contraband or evidence
relating to other crimes outside the scope of the items to be
seized without first obtaining a further warrant to search for
and seize such contraband or evidence.

    9.   The Privilege Review Team and the Search Team will
complete the search of non-content information and both stages
of the search of the content records discussed herein as soon as
is practicable but not to exceed 180 days from the date of
receipt from the PROVIDER-1 of the response to this warrant.
The government will not search the records beyond this 180-day
period without first obtaining an extension of time order from
the Court.

    10.  Once the Privilege Review Team and the Search Team
have completed their review of the non-content information and
the content records and the Search Team has created copies of
the items seized pursuant to the warrant, the original

production from the PROVIDER-1 will be sealed -- and preserved
by the Search Team for authenticity and chain of custody
purposes -- until further order of the Court.  Thereafter,
neither the Privilege Review Team nor the Search Team will
access the data from the sealed original production which fell
outside the scope of the items to be seized or was determined to
be privileged absent further order of the Court.

11.  The special procedures relating to digital data found
in this warrant govern only the search of digital data pursuant
to the authority conferred by this warrant and do not apply to
any search of digital data pursuant to any other court order.

12.  Pursuant to 18 U.S.C. § 2703(g) the presence of an
agent is not required for service or execution of this warrant.

II.    **INFORMATION TO BE DISCLOSED BY THE PROVIDER**

13.  To the extent that the information described in
Attachment A-1 is within the possession, custody, or control of
the PROVIDER-1, regardless of whether such information is
located within or outside of the United States, including any
information that has been deleted but is still available to the
PROVIDER, or has been preserved pursuant to a request made under
18 U.S.C. § 2703(f), the PROVIDER-1 is required to disclose the
following information to the government for the SUBJECT ACCOUNT-
1 listed in Attachment A-1:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT-1, limited to that which occurred between January 1, 2015 through October 11, 2020,[1] including:

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT-1, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT-1, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT-1, including contacts with support services and records of actions taken.

---

[1] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNT-1.

ii.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT-1 described above in Section II.13.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups,

and locations, and including specifically the specific product name or service to which the connection was made.

iii. any other account associated with the SUBJECT ACCOUNT-1, including by means of sharing a common secondary, recovery, or alternate **email address listed in subscriber records** for the SUBJECT ACCOUNT-1 or by means of sharing a **common phone number or SMS number listed in subscriber records** for the SUBJECT ACCOUNT-1, and any account that lists the SUBJECT ACCOUNT-1 as a secondary, recovery, or alternate email address.

### III.   **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

14.  For the SUBJECT ACCOUNT-1 listed in Attachment A-1, the search team may seize:

a.   All information described above in Section II.13.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (conspiracy to defraud the United States of America), 1956 (money laundering), 1344 (bank fraud), 1001 (false statements), and Title 26, United States Code, sections 7201 (evasion of payment of tax), 7206(1) (subscription to a false tax return), 7206(2) (aiding and assisting in the preparation of a false tax return), and 7212 (attempts to interfere with administration of internal revenue laws) (the "SUBJECT OFFENSES"), namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT-1, including records about their identities and whereabouts;

ii.  Information related to how and when the SUBJECT ACCOUNT-1 was accessed or used;

iii. Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence from any individual pertaining to the filing of a U.S. Individual Income Return, IRS Form 1040, by Charles "Chuck" Pacheco (hereinafter "Pacheco") for 2014;

iv.  Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence for any individual pertaining to the filing of any Amended U.S. Individual Income Return, Form 1040X, by Pacheco for 2014;

v.   Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence for any individual pertaining to the filing of a U.S. Income Tax Return for a S Corporation, Form 1120S, for the Chuck Pacheco Corporation for 2015;

vi.  Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence for any individual pertaining to an IRS Form 1045, Application for Tentative Refund, for Pacheco for 2015;

vii. Records, documents, programs, applications, or materials regarding any tax-related records, filings, or

correspondence for any individual pertaining to the collection
of tax due to the Internal Revenue Service of Pacheco for 2014;

       viii.    Records, documents, programs,
applications, or materials regarding any tax-related records,
filings, or correspondence with the Internal Revenue Service
pertaining to tax years 2014 and 2015;

       ix.  Records, documents, programs, applications,
or materials regarding any tax-related records, filings, or
correspondence from any individual pertaining to IRS Form 433-A,
Collection Information Statement for Wage Earners and Self-
Employed Individuals;

       x.  Records, documents, programs, applications,
or materials regarding payments of gambling debt to individuals
or casinos on behalf of Pacheco;

       xi.  Records, documents, programs, applications,
or materials pertaining to Nine Nights All-Star Weekend, LLC,
Bah Lo Nee, LLC, Eye Productions All Star, LLC, ASL, LLC, RSTT,
Inc., Nine Nights Priceless Productions LLC, Andrew Beal, Alec
Gores, Bosko Djordjevic, Sam Magid, and Garrett Mitton;

       xii. Records, documents, programs, applications,
or materials regarding movement of funds outside the United
States by Jeffrey Helfer (hereinafter "Helfer") and Pacheco, to
Singapore and Macau, China, a company named New Lotus
Investments, financial institutions Bank of China, Banco
Commercial De Macau, and DBS Bank, and Christopher Patrick
Milligan and Joao Miguel Barros;

xiii.    Records, documents, programs, applications, or materials regarding transfers of funds to/from Pacheco and Helfer into accounts owned by either, in a personal capacity, as an officer of a corporation, or as an IOLTA (Interest on Lawyer's Trust Account);

xiv. Opening of accounts at financial institutions First Republic Bank and Wells Fargo in 2016 by Pacheco and Helfer;

xv.  Information relating to the location, storage, or concealment of cash, money instruments, virtual currency, or money equivalents;

xvi. Records, documents, programs, applications, or materials regarding transfer of money from Pacheco and Helfer to Dr. Prabaal Dey and Cavanaugh Investment Group, financing transactions/loans between these parties, and the execution of a deed of trust in 2018 for property in Indio, California;

xvii.    Records, documents, programs, applications, or materials regarding a "2015 Profit and Loss Statement" submitted to First Republic Bank in 2016 for Pacheco;

xviii.    Records documents, programs, applications, or materials referring or relating to payments or transfers from or on behalf of Pacheco over $10,000 since April 15, 2015;

xix. Records, documents, programs, applications, or materials referring to assets held by or for Pacheco over $10,000 since April 15, 2015;

xx.   Records, documents, programs, applications, or materials referring or relating to evading IRS tax liens and levies, such as transferring money rapidly from an account 30 days before an IRS lien/levy took effect, or transferring funds to overseas accounts beyond the subpoena authority of the U.S. government, or placing funds in accounts held in the names of persons other than Pacheco;

xxi. Records, documents, programs, applications, or materials referring or relating to forestalling IRS actions to collect Pacheco's 2014 tax liability, or purporting to justify delays in providing documents or information to the IRS, or delays in IRS actions;

xxii.   Records, documents, programs, applications, or materials referring or relating to purported loans exceeding $100,000 from persons/entities other than financial institutions; and

xxiii.   Records referring or relating to defeating anti-money laundering scrutiny.

b.   All records and information described above in Section II.13.b.

## IV.   <u>PROVIDER PROCEDURES</u>

15.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

Special Agent Robbie Henwood
4330 Watt Ave.
Sacramento, CA 95821
210-389-3980
Robbie.Henwood@ci.irs.gov

16.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

**ATTACHMENT B-2**

**ITEMS TO BE SEIZED**

I. **SEARCH PROCEDURE INCLUDING PRIVILEGE REVIEW PROCEDURE**

1.    The search warrant will be presented to personnel of Yahoo Inc. (the "PROVIDER-2"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER-2's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER-2's employees will provide the Section II information in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER-2 (hereafter, "content records," see Section II.13.a. below), law enforcement agents and/or other individuals assisting law enforcement agents who are not participating in the investigation of the case and who are assigned as the "Privilege Review Team" will review the content records, according to the procedures set forth herein, to determine whether or not any of the content records appears

i

to contain or refer to communications between Jeffrey Helfer,
Jordan Bass, Nathan Hochman or to contain the work product of
Jeffrey Helfer, Jordan Bass, Nathan Hochman, and any person
("potentially privileged information").  The "Search Team" (law
enforcement personnel conducting the investigation and search
and other individuals assisting law enforcement personnel in the
search) will review only content records which have been
released by the Privilege Review Team.  With respect to the non-
content information produced by the PROVIDER-2 (see Section
II.13.b. below), no privilege review need be performed and the
Search Team may review immediately.

5.   The Search Team will provide the Privilege Review Team
with a list of "privilege key words" to search for in the
content records, to include specific words like Jeffrey Helfer,
Jordan Bass, Law Offices of Jeffrey Helfer, and Law Offices of
Jordan Bass, Nathan Hochman, Ross LLP, their email addresses,
and generic words such as "privileged" and "work product".  The
Privilege Review Team will conduct an initial review of all of
the content records by using the privilege key words, and by
using search protocols specifically chosen to identify content
records containing potentially privileged information.  Content
records that are not identified by this initial review as
potentially privileged may be given to the Search Team.

6.    Content records that the initial review identifies as potentially privileged will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information.  Content records determined by this review not to be potentially privileged may be given to the Search Team. Content records determined by this review to be potentially privileged will be given to the United States Attorney's Office for further review by a Privilege Review Team Attorney ("PRT Attorney").  Content records identified by the PRT Attorney after review as not potentially privileged may be given to the Search Team.  If, after review, the PRT Attorney determines it to be appropriate, the PRT Attorney may apply to the court for a finding with respect to particular content records that no privilege, or an exception to the privilege, applies.  Content records that are the subject of such a finding may be given to the Search Team.  Content records identified by the PRT Attorney after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

7.    The Search Team will search only the content records that the Privilege Review Team provides to the Search Team at any step listed above in order to locate, extract and seize content records that are within the scope of the search warrant (see Section III below).  The Search Team does not have to wait

until the entire privilege review is concluded to begin its review for content records within the scope of the search warrant.  The Privilege Review Team may also conduct the search for content records within the scope of the search warrant if that is more efficient.  The search may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

8.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

9.   The Privilege Review Team and the Search Team will complete the search of non-content information and both stages of the search of the content records discussed herein as soon as is practicable but not to exceed 180 days from the date of receipt from the PROVIDER-2 of the response to this warrant. The government will not search the records beyond this 180-day period without first obtaining an extension of time order from the Court.

10.   Once the Privilege Review Team and the Search Team have completed their review of the non-content information and the content records and the Search Team has created copies of the items seized pursuant to the warrant, the original

production from the PROVIDER-2 will be sealed -- and preserved by the Search Team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, neither the Privilege Review Team nor the Search Team will access the data from the sealed original production which fell outside the scope of the items to be seized or was determined to be privileged absent further order of the Court.

11.  The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

12.  Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.    INFORMATION TO BE DISCLOSED BY THE PROVIDER

13.  To the extent that the information described in Attachment A-2 is within the possession, custody, or control of the PROVIDER-2, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER-2 is required to disclose the following information to the government for the SUBJECT ACCOUNT-2 listed in Attachment A-2:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT-2, limited to that which occurred between January 1, 2015 through October 11, 2020,[1] including:

i.   All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT-2, including stored or preserved copies of messages sent to and from the account, draft messages, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each email or message (including the actual IP addresses of the sender and recipients of the emails), and any related documents or attachments.

ii.   All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT-2, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT-2, including contacts with support services and records of actions taken.

---

[1] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

b.   All other records and information, including:

i.   All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the SUBJECT ACCOUNT-2.

ii.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT-2 described above in Section II.13.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups,

and locations, and including specifically the specific product name or service to which the connection was made.

iii. any other account associated with the SUBJECT ACCOUNT-2, including by means of sharing a common secondary, recovery, or alternate **email address listed in subscriber records** for the SUBJECT ACCOUNT-2 or by means of sharing a **common phone number or SMS number listed in subscriber records** for the SUBJECT ACCOUNT-2, and any account that lists the SUBJECT ACCOUNT-2 as a secondary, recovery, or alternate email address.

### III.   **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

14.  For the SUBJECT ACCOUNT-2 listed in Attachment A-2, the search team may seize:

a.   All information described above in Section II.13.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (conspiracy to defraud the United States of America), 1956 (money laundering), 1344 (bank fraud), 1001 (false statements), and Title 26, United States Code, sections 7201 (evasion of payment of tax), 7206(1) (subscription to a false tax return), 7206(2) (aiding and assisting in the preparation of a false tax return), and 7212 (attempts to interfere with administration of internal revenue laws) (the "SUBJECT OFFENSES"), namely:

   i. Information relating to who created, accessed, or used the SUBJECT ACCOUNT-2, including records about their identities and whereabouts;

   ii. Information related to how and when the SUBJECT ACCOUNT-2 was accessed or used;

   iii. Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence from any individual pertaining to the filing of a U.S. Individual Income Return, IRS Form 1040, by Charles "Chuck" Pacheco (hereinafter "Pacheco") for 2014;

   iv. Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence for any individual pertaining to the filing of any Amended U.S. Individual Income Return, Form 1040X, by Pacheco for 2014;

   v. Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence for any individual pertaining to the filing of a U.S. Income Tax Return for a S Corporation, Form 1120S, for the Chuck Pacheco Corporation for 2015;

   vi. Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence for any individual pertaining to an IRS Form 1045, Application for Tentative Refund, for Pacheco for 2015;

   vii. Records, documents, programs, applications, or materials regarding any tax-related records, filings, or

correspondence for any individual pertaining to the collection of tax due to the Internal Revenue Service of Pacheco for 2014;

viii.    Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence with the Internal Revenue Service pertaining to tax years 2014 and 2015;

ix. Records, documents, programs, applications, or materials regarding any tax-related records, filings, or correspondence from any individual pertaining to IRS Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals;

x. Records, documents, programs, applications, or materials regarding payments of gambling debt to individuals or casinos on behalf of Pacheco;

xi. Records, documents, programs, applications, or materials pertaining to Nine Nights All-Star Weekend, LLC, Bah Lo Nee, LLC, Eye Productions All Star, LLC, ASL, LLC, RSTT, Inc., Nine Nights Priceless Productions LLC, Andrew Beal, Alec Gores, Bosko Djordjevic, Sam Magid, and Garrett Mitton;

xii. Records, documents, programs, applications, or materials regarding movement of funds outside the United States by Jeffrey Helfer (hereinafter "Helfer") and Pacheco, to Singapore and Macau, China, a company named New Lotus Investments, financial institutions Bank of China, Banco Commercial De Macau, and DBS Bank, and Christopher Patrick Milligan and Joao Miguel Barros;

xiii.    Records, documents, programs, applications, or materials regarding transfers of funds to/from Pacheco and Helfer into accounts owned by either, in a personal capacity, as an officer of a corporation, or as an IOLTA (Interest on Lawyer's Trust Account);

xiv. Opening of accounts at financial institutions First Republic Bank and Wells Fargo in 2016 by Pacheco and Helfer;

xv.  Information relating to the location, storage, or concealment of cash, money instruments, virtual currency, or money equivalents;

xvi. Records, documents, programs, applications, or materials regarding transfer of money from Pacheco and Helfer to Dr. Prabaal Dey and Cavanaugh Investment Group, financing transactions/loans between these parties, and the execution of a deed of trust in 2018 for property in Indio, California;

xvii.    Records, documents, programs, applications, or materials regarding a "2015 Profit and Loss Statement" submitted to First Republic Bank in 2016 for Pacheco;

xviii.    Records documents, programs, applications, or materials referring or relating to payments or transfers from or on behalf of Pacheco over $10,000 since April 15, 2015;

xix. Records, documents, programs, applications, or materials referring to assets held by or for Pacheco over $10,000 since April 15, 2015;

xx.   Records, documents, programs, applications, or materials referring or relating to evading IRS tax liens and levies, such as transferring money rapidly from an account 30 days before an IRS lien/levy took effect, or transferring funds to overseas accounts beyond the subpoena authority of the U.S. government, or placing funds in accounts held in the names of persons other than Pacheco;

xxi. Records, documents, programs, applications, or materials referring or relating to forestalling IRS actions to collect Pacheco's 2014 tax liability, or purporting to justify delays in providing documents or information to the IRS, or delays in IRS actions;

xxii.   Records, documents, programs, applications, or materials referring or relating to purported loans exceeding $100,000 from persons/entities other than financial institutions; and

xxiii.   Records referring or relating to defeating anti-money laundering scrutiny.

b.   All records and information described above in Section II.13.b.

IV.   **PROVIDER PROCEDURES**

15.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

Special Agent Robbie Henwood
4330 Watt Ave.
Sacramento, CA 95821
210-389-3980
Robbie.Henwood@ci.irs.gov

16.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.